IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,      )
                               )
              Plaintiff,       )
                               )
v.                             )            No. 3:21-CR-40-RLJ-DCP-1
                               )
SAMUEL D. HILL,                )
                               )
              Defendant.       )

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This matter is before the Court on Defendant's Motion to Suppress Physical Evidence [Doc. 22], filed on July 30, 2021. The Government filed a response to Defendant's Motion to Suppress Physical Evidence on August 9, 2021 [Doc. 23]. An evidentiary hearing was held on Defendant's motion on November 16, 2021. [Doc. 53]. Assistant United States Attorneys Alan S. Kirk and Brent N. Jones appeared on behalf of the Government. Attorney Robert R. Kurtz appeared on behalf of Defendant, who was also present. After hearing the arguments of counsel, the Court took the motion under advisement.[1]

---

[1] Following the evidentiary hearing, the Government filed a Notice of Additional Disclosures [Doc. 56] on November 18, 2021. As indicated in the Notice, the undersigned previously ordered the release of Co-defendant Sarah McKinney subject to conditions, including that McKinney was not to use or unlawfully possess a narcotic drug or other controlled substance defined in 21 U.S.C. § 802 and that McKinney would truthfully answer all inquiries from the United States Probation Office ("USPO"). The Government called Co-defendant McKinney as a witness at the November 16, 2021 evidentiary hearing. When asked by the Government if she had been in compliance with her release conditions, McKinney testified, "Yes." However, on November 17, 2021, McKinney admitted to her USPO Officer during an interview at McKinney's residence that she had used a small amount of heroin on the morning of November 15, 2021. McKinney was subsequently tested for controlled substances and the result was negative. The Government was informed of McKinney's interview and her admission of using heroin on

After reviewing the parties' briefs and arguments, the evidence and exhibits presented at the hearing, and the relevant legal authorities, the Court recommends that Defendant's Motion to Suppress Physical Evidence [Doc. 22] be denied.[2]

## I.    POSITIONS OF THE PARTIES

Defendant seeks [Doc. 22] to suppress the currency and cellphones he had in his possession during a traffic stop conducted on May 13, 2020.  Defendant argues that the currency and cellphones were recovered during an illegal seizure or after an illegal arrest.  [*Id.*].  Defendant states this is because the police officer who ordered Defendant out of the car and handcuffed him based on suspicion of providing a false name lacked probable cause or even reasonable suspicion to believe that Defendant had committed any crime.  [*Id.*].

The Government responds [Doc. 23] that Defendant's Motion to Suppress Physical Evidence [Doc. 22] should be denied because the detention of Defendant in a police vehicle, the search of the vehicle in which Defendant was a passenger, and the search of Defendant's person leading to his arrest were lawful.

## II.    SUMMARY OF TESTIMONY

At the November 16, 2021 hearing, the Government presented the testimony of Task Force Officer Todd Strickenberger ("Officer Strickenberger"), Knoxville Police Department ("KPD") Officer Chris Hutton ("Officer Hutton"), and Co-defendant Sarah McKinney ("McKinney").  The

---

November 17, 2021.  The Government stated that, based on the negative drug test, it is possible that McKinney may have unknowingly used a non-controlled substance on November 15, 2021; however, it is also possible that McKinney used heroin on that same date, in violation of her conditions of release, and thus provided an untruthful statement under oath while testifying at Defendant's suppression hearing.  The Court has considered the Government's Notice and the impact it may have on Co-defendant McKinney's testimony.

[2] The court has also considered Defendant's Motion to Preclude Introduction of Prior Convictions [Doc. 30] and Motion to Sever [Doc. 31] and addresses them in separate memoranda and orders.

2

Government and Defendant also introduced several exhibits. The Court summarizes the witnesses' testimony and exhibits as follows.

The Government first presented the testimony of Officer Strickenberger, who testified that he has been a task force officer with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") for three (3) years and is assigned to the KPD's organized crime unit. Officer Strickenberger stated he has been employed with the KPD for approximately twenty (20) years, serving in various capacities during that time. Officer Strickenberger described his duties as an ATF officer, including his investigations into cases involving firearms and narcotics trafficking.

Officer Strickenberger testified that he initiated the investigation into McKinney on his own. Officer Strickenberger explained federal firearms licensees ("FFLs") are required through their licenses to provide the ATF with a notification about individuals purchasing more than one handgun within a 72-hour period, and these notifications are one of his investigative tools. Officer Strickenberger testified that purchasing handguns in such a manner is a possible indicator of dealing firearms without licenses or "straw purchases." Officer Strickenberger stated he reviews these FFL notifications at the end of every month for investigative probability.

Officer Strickenberger explained this specific case drew his attention after he noticed around May 1, 2020, that McKinney had purchased three firearms towards the end of the month—possibly around April 30, 2020. Officer Strickenberger noticed that McKinney had done the same thing two days prior and had purchased a total of six guns in a two-to-three-day period. Officer Strickenberger conducted an initial investigation by pulling up McKinney's Tennessee Portal, which gives him access to McKinney's driver's license photo, driver's license status, and criminal history. Officer Strickenberger noticed McKinney had minimal criminal history with some local misdemeanors and a suspended driver's license.

3

Officer Strickenberger testified he was able to deduce from some of KPD's reporting systems that McKinney appeared on some reports along with her presumed boyfriend, Jared Orr ("Orr"), a known Gangster Disciple. Officer Strickenberger explained that part of his investigation is to determine or theorize as to why some of these individuals would be buying firearms—such as for a local gang, and he was investigating McKinney with that possibility in mind.

Officer Strickenberger testified that on May 13, 2020,[3] he conducted surveillance on McKinney at her known domicile on Jourolman Avenue with Special Agent Matthew Ernst ("Agent Ernst"). After about 40–45 minutes, the two noticed a gold-colored Chevrolet Trailblazer SUV ("gold SUV"), which they knew McKinney to operate, leaving the rear of the residence. Officer Strickenberger stated he watched McKinney travel east through the alley, and he noticed a red Acura MXD ("red Acura") immediately following her.

Officer Strickenberger stated he had checked the status of McKinney's driver's license as part of his initial investigation—a couple days into May—and again the morning of the surveillance on May 13. He stated he had also investigated Orr's background at that time, and he learned both of their drivers' licenses were suspended, and that Orr was a convicted felon. Officer Strickenberger stated he had both McKinney's and Orr's driver's license photos with him, so he generally knew what the two looked like.

Officer Strickenberger was asked to describe how the dash camera systems in KPD patrol cars worked during that time period. Officer Strickenberger explained that, at that time, the host recording device was in the car itself. The primary camera had a lens that protruded to the front of the vehicle that could be flipped around if there was someone in the vehicle, but generally the

---

[3] Officer Strickenberger initially testified that surveillance was conducted on May 6, 2020, acknowledging that he could have been off a few days. He later clarified that May 13, 2020, was the correct date.

camera was angled or pointed towards the front. The microphones are affixed to the officers' uniforms, and their microphones would sync to the car's video system. Officer Strickenberger estimated an officer could go a few hundred feet from the car before losing the syncing capability. The device could be manually operated, but it also turned on automatically if an officer activated the emergency equipment. Officer Strickenberger stated KPD stores the data files from the recordings. The data files are housed on a server for a short time before being placed on a disk and stored onsite to be pulled as needed. The Government then introduced Exhibit 1—the combined dash camera video from the events on May 13, 2020—and Exhibit 1A that is substantially the same as Exhibit 1 but with enhanced audio.

Officer Strickenberger stated he and Agent Ernst observed the gold SUV and the red Acura leave the rear of McKinney's residence and travel towards East Knoxville. Officer Strickenberger explained they traveled on I-40 east, ultimately getting off at the Hall of Fame exit, before heading east on Magnolia. He noted that McKinney was operating the gold SUV but added there were a couple other individuals in the vehicle, whom he had not identified. Officer Strickenberger stated they pulled into a gas station at the corner of Baxter and Beaumont and a few people switched seats on the passenger side.

Officer Strickenberger testified he was unsure of who was in the red Acura when he first saw it. Officer Strickenberger stated that while on Magnolia, the red Acura diverted from following McKinney's vehicle causing the officers to lose visual contact. However, they continued to surveil McKinney, who eventually pulled into Cash America Pawn on Magnolia. Officer Strickenberger stated he was familiar with this pawn shop because it was an FFL. He detailed that McKinney was in the pawn shop for 10–15 minutes before leaving empty handed and

entering the gold SUV. Officer Strickenberger testified no one else was in the vehicle with McKinney at that time, and she proceeded eastbound on Magnolia.

Officer Strickenberger explained he decided to make a traffic stop on McKinney's gold SUV based on the probable cause of her operating her vehicle with a suspended license. Officer Strickenberger stated McKinney turned left into an Exxon gas station, and he turned on his blue lights as she was pulling up to the gas pumps. McKinney stopped at the gas pumps. At that same moment, Officer Strickenberger noticed the red Acura stopped behind McKinney.

Government's Exhibit 1 was then admitted into evidence, and Officer Strickenberger narrated the footage.[4] Officer Strickenberger identified his patrol car in the top left square of the video which displays Officer Hutton's dash camera video. In the same square, Officer Strickenberger identified the vehicle directly in front of the hood of his patrol car as being the gold SUV that McKinney was driving. Finally, Officer Strickenberger identified the red Acura in the same square.

Officer Strickenberger testified he approached McKinney, explained the reason he had stopped her, and told her he wanted to speak with her. At that time, Officer Strickenberger realized there was an officer safety issue because of the potential involvement of another individual, whom he identified in his earlier investigation, so he directed Agent Ernst to stay with the red Acura. Officer Strickenberger then went back to speak with the driver of the red Acura and recognized Orr as the driver. Officer Strickenberger explained he had prior knowledge of Orr having a suspended license, and he advised Agent Ernst of this.

Officer Strickenberger observed other passengers in the red Acura—an older white male in the front passenger seat and an unknown black male in the backseat directly behind the

---

[4] Exhibits 1 and 1A include a combination of the dash camera videos of Officer Hutton in the top left, Officer Lively on the right, and Officer Ward in the bottom right.

6

passenger. Officer Strickenberger stated these two other individuals were later identified as Michael Abbott ("Abbott"), McKinney's father, in the front passenger seat, and Defendant, the backseat passenger. Officer Strickenberger testified he asked Orr if there was any contraband in the vehicle, and Orr willfully cooperated, providing the officers with a small blue bag containing armbands and needles—drug paraphernalia consistent with heroin use. Officer Strickenberger stated he and Agent Ernst took custody of that paraphernalia and photographed it. Officer Strickenberger then called for backup through his KPD radio to assist with security of the situation.

Officer Strickenberger said he then returned to McKinney, asked her to step from her vehicle, and told her he wanted to talk to her about her recent purchases of six handguns. Officer Strickenberger stated McKinney informed him[5] she had purchased the firearms for a gentleman

---

[5] At this point, defense counsel objected on grounds of hearsay. The Government argued the rules of evidence do not apply to suppression hearings.

"At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial." *United States v. Raddatz*, 447 U.S. 667, 679 (1980). The Court may rely on such hearsay evidence so long as it is "credible and competent." *United States v. Kellog*, 202 F. App'x 96, 106 (6th Cir. 2006) (Griffin, J. concurring in part and dissenting in part), *cert. denied*, 549 U.S. 1259 (2007); *see, e.g.*, *United States v. Killebrew*, 594 F.2d 1103, 1105 (6th Cir.), *cert denied*, 442 U.S. 933 (1979); *United States v. Manning*, No. CR 17-20469, 2018 WL 3134566, at *3 (E.D. Mich. June 27, 2018). "[T]he right of confrontation does not apply to the same extent at pretrial suppression hearings as it does at trial. 'The interests at stake in a suppression hearing are of a lesser magnitude than those in the criminal trial itself.'" *United States v. Boyce,* 797 F.2d 691, 693 (8th Cir. 1986) (*quoting Raddatz,* 447 U.S. at 679); *see, e.g.*, *United States v. Garcia*, 324 F. App'x 705, 708 (10th Cir.) ("There is no binding precedent from the Supreme Court or this court concerning whether *Crawford* applies to pretrial suppression hearings. To the extent that we can divine clues from our case law concerning the resolution of this issue, they do not benefit Mr. Garcia."), *cert. denied*, 558 U.S. 890 (2009).

Ultimately, the Court finds McKinney's declaration to be credible and competent, and the Court will consider this out-of-court statement in resolving Defendant's motion to suppress. Furthermore, the Court finds that McKinney's statements were made against her own interest such that they have their own "indicia of reliability." *See U.S. v. Matlock*, 415 U.S. 164, 176 (1974) (finding that statements made against declarant's penal interest implicated her in a state crime and, thus, were admissible at a suppression hearing, even if inadmissible at trial).

7

named "Gizmo," whom she identified as the man sitting in the backseat of the red Acura (Defendant), and she stated that he was a heroin dealer.

Officer Strickenberger proceeded to identify the other officers in the video.[6]  Officer Strickenberger testified it was his practice as a law enforcement officer to brief other officers when they arrive at a scene on what is happening; however, Officer Strickenberger stated he could not recall having said anything to the officers who were arriving on the scene at the Exxon gas station about what was happening.  Officer Strickenberger then identified newcomers arriving on the scene in a police SUV—Officer Baldwin, his K-9 unit, and Officer Baldwin's trainee.

Officer Strickenberger testified Orr had been asked for consent to search his vehicle, which he gave, and Officer Baldwin subsequently deployed his K-9 unit around the Acura.  Officer Strickenberger explained that he always has a K-9 deployed, if available, "just to make sure [he] is doing everything right."  Officer Strickenberger stated the passengers and the driver were removed from the vehicle prior to it being searched.  Officer Strickenberger was asked if he took any photographs of the evidence at the scene.  He responded that he photographed the evidence with his phone, and the photographs were provided to the U.S. Attorney's office as part of the case file.

Officer Strickenberger then testified concerning each of the photographs entered as Exhibits 2–6.  Government Exhibit 2 was a photograph of the backseat of the red Acura, where Defendant had been seated.  Officer Strickenberger identified what he had suspected were baggies containing heroin and MDMA pills in the photograph, but which later tested as methamphetamine.

---

[6] In the top right square, Officer Strickenberger identified Officer Hutton, Officer Rourke, himself, and Agent Ernst's pickup truck.  In the top left square, Officer Strickenberger identified Officer Lively and Officer Lively's vehicle.

8

Government Exhibit 3 depicted the cargo area of the red Acura. Officer Strickenberger identified the baggies in the photograph as containing suspected heroin, and he claimed the baggies were located directly behind the backseat where Defendant had been sitting.

Government Exhibit 4 showed two cellphones that were seized from Defendant, which are the subject of the instant motion to suppress. Officer Strickenberger testified that these phones were taken out of Defendant's pocket.

Lastly, Officer Strickenberger reviewed Government Exhibits 5 and 6, noting they were photographs depicting $2,100 in cash that was seized from Defendant's pocket and taken from two different angles looking down into Defendant's pockets. This currency is also a subject of the instant suppression motion.

Officer Strickenberger was then cross-examined by Attorney Kurtz. Officer Strickenberger testified he had begun investigating McKinney around May 5, 2020. Officer Strickenberger pulled McKinney's driver's license information at that time and discovered her license was suspended. Officer Strickenberger explained he learned at that time that Orr and McKinney may have been romantically involved and that Orr's driver's license was also suspended.

Officer Strickenberger testified he learned during his investigation that Orr was a member of the Gangster Disciples, an organized street gang in the Knoxville area as well as across the country. Officer Strickenberger testified the Gangster Disciples are known for trafficking in firearms and illegal narcotics. Officer Strickenberger testified he had been aware in the weeks leading up to May 13, 2020, that Orr was a convicted felon.

Officer Strickenberger testified he began surveilling McKinney's residence, which is located at 1540 Jourolman Avenue,[7] on May 13 around 11:00–11:30 a.m. Officer Strickenberger stated that another street, Toms Drive, runs along the side of the residence. He was positioned at the convenience store at the corner of Beaumont and Toms, looking northeast towards the back of McKinney's residence during the surveillance. Officer Strickenberger testified he took no videos or photographs of the residence during or after the surveillance.

Officer Strickenberger testified Agent Ernst was also participating in the surveillance, and he believed Agent Ernst was located east of him towards the interstate on the other side of Oldham and Jourolman. Officer Strickenberger could not testify as to the scope of Agent Ernst's view of the home. Officer Strickenberger stated only he and Agent Ernst participated in the surveillance, and they were in communication via phone and/or radio; however, the communications were not recorded.

Officer Strickenberger testified he surveilled the residence for roughly thirty minutes to an hour. During that time, Officer Strickenberger did not see anyone or any vehicles arrive at the residence, and he did not observe anyone leave it prior to his following the gold SUV and the red Acura. Officer Strickenberger again stated he had checked both McKinney's and Orr's drivers' license statuses that morning prior to beginning the surveillance on the residence. Officer Strickenberger stated he observed only the gold SUV and red Acura at the residence.

Officer Strickenberger testified the gold SUV left the residence first and was followed by the red Acura seconds later. Initially, he could not see who was operating either of the vehicles or

---

[7] Officer Strickenberger stated McKinney resided at 1540 Jourolman Avenue. McKinney's residence is at the intersection of three streets and at the corner where Jourolman and West Oldham meet.

whether the vehicles contained any other occupants. Officer Strickenberger stated they traveled down the alley away from Toms Drive, which would have been the closest street to the residence.

He stated the gold SUV first stopped at the gas station at the corner of Baxter and Beaumont, where the passengers swapped positions as described earlier. Officer Strickenberger testified McKinney was operating the gold SUV at that point. Officer Strickenberger stated that he was unaware of the red Acura's location at that time and that he lost sight of the vehicle for approximately 10–15 minutes while McKinney was in the pawn shop. Agent Ernst had informed Officer Strickenberger that the red Acura had stopped at a liquor store; however, Agent Ernst was recalled by Officer Strickenberger because they decided the gold SUV was the primary target. Officer Strickenberger could not testify as to how long Agent Ernst lost sight of the red Acura or if anyone had been dropped off or picked up during that time.

Officer Strickenberger explained McKinney's gold SUV was still in motion when he turned his emergency lights on at the Exxon gas station, but the red Acura was already parked at the gas pumps, indicating it had arrived prior to the gold SUV. Officer Strickenberger was still unaware of the identities of the red Acura's occupants, but he learned their identities during the investigation and discovered there had been a fourth occupant, an individual named Phillip Walters ("Walters"), who Officer Strickenberger knew had a lengthy criminal record. Officer Strickenberger testified he did not know who drove the red Acura to the Exxon gas station, but he had seen Orr in the driver's seat when he looked at it while it was stationary. Officer Strickenberger explained Officer Hutton interacted with Defendant during the stop, but Officer Strickenberger did not interact with Defendant until after he was placed under arrest.

Officer Strickenberger stated he was unaware at the time that the red Acura had three rows of seats. Officer Strickenberger was shown a photo of the cargo area of the vehicle (Exhibit 7).

Officer Strickenberger stated the Acura MDX is a mid-size SUV, the rear cargo area was only about a foot deep, and the vertical carpeting in the photograph was on the back of the third row of seats. Officer Strickenberger was shown Government Exhibit 2 and asked if the photo actually depicted the third row of seats instead of the middle row where Defendant had been sitting. Officer Strickenberger said, "Not to my recollection, no."

Attorney Kurtz asked if Officer Strickenberger had seen in Exhibit 1 (the video of the traffic stop) where Officer Hutton had been speaking to Defendant. Officer Strickenberger confirmed he had seen this portion of Exhibit 1 and testified Officer Hutton had been positioned at the rear passenger door, Defendant's legs had come out of the rear passenger door, and that was where Officer Hutton frisked Defendant. Officer Strickenberger was asked if Officer Hutton had been speaking to Defendant while he had been seated in the second row the entire time, and he said, "All I can say is where that photo [Exhibit 2] was taken is where Mr. Hill was seated."

Officer Strickenberger stated he had not interacted with Defendant at that time, but he had seen Defendant sitting in the vehicle, and that, if there was a third row, it did not appear to him Defendant had been seated there but was seated where the photograph was taken. Officer Strickenberger stated he understood that Defendant had been seated immediately behind the front passenger seat.

Officer Strickenberger testified he did not conduct the search of the vehicle, but it was his understanding the recovery of the suspected heroin was made from the back cargo area. Upon being shown Exhibit 2, Officer Strickenberger said, "That is where Mr. Hill was seated." Officer Strickenberger stated he had been told that by another officer.

Officer Strickenberger explained he may have been misinformed by the other officers as to where Defendant had been sitting based on the location from which the other officers said he

12

was pulled. Attorney Kurtz posited that if Exhibit 2 actually shows the backpack and the suspected heroin packets in the third row, then it would not have been in the immediate vicinity of Defendant. Officer Strickenberger responded that would be possible if Defendant had been seated in the row of seats in front of the row depicted in Government Exhibit 2; however, he explained he had been advised that Defendant was seated where the backpack is shown in Government Exhibit 2.

Officer Strickenberger said he was never told where Walters, the fourth occupant, had been sitting. Officer Strickenberger testified when he first saw the occupants of the red Acura, he saw Orr in the driver's seat, Abbott in the front passenger seat, and Defendant in the rear passenger seat, leaving the rear driver's side seat and the third row empty.

Officer Strickenberger testified Orr and Abbott were not arrested, cited, or charged for any of the conduct on May 13. Officer Strickenberger could not recall whether the gold SUV or the red Acura were towed that day or placed on hold for evidentiary purposes. Officer Strickenberger stated it would be normal to release such a vehicle once officers had exhausted their investigation at the scene, and he explained his personal investigation was completed at that point even if the investigation had continued in general for a week or two afterwards.

Officer Strickenberger stated again that the officers' microphones described earlier would have been affixed to their uniform, but he also stated it was not KPD policy to have audio running constantly. He explained KPD policy permits officers to turn their microphones off when they are conversing privately between each other, but he could not say whether "privately" included personal matters and/or discussion about the facts of a case and the investigation.

Officer Strickenberger testified a weapon was found in the side pocket of the front passenger door next to Abbot.

13

The Government posed additional questions on redirect examination. Officer Strickenberger explained that when he looked into the red Acura, he was able to see through the front driver's side window and possibly a bit through the windshield because he had spoken with Orr who had been sitting in the driver's seat. The Government then reviewed Exhibit 1 again and paused the video at roughly the one-minute mark. Officer Strickenberger identified Agent Ernst in the video and stated he appeared to be standing at the driver's side of the vehicle.

Officer Strickenberger stated the firearm found in the vehicle was an "FN nine-millimeter, loaded[,]" being consistent with a handgun. The Government asked if Abbott had said anything about the handgun.[8] Officer Strickenberger stated Abbott told him Defendant had given him the gun as he (Officer Strickenberger) was approaching McKinney's vehicle. Officer Strickenberger said Orr had told him the same thing Abbott had related. Officer Strickenberger also stated Abbott passed away on July 24, 2021. Officer Strickenberger stated McKinney had referred to the backseat passenger of the red Acura as "Gizmo," and she had been referring to Defendant.

The Government presented the testimony of Officer Hutton who stated he is currently employed by KPD as a supervisor on patrol in KPD's west district but has had various assignments, continuing education, and in-service training since starting with KPD in 2011. The Government then brought up Exhibit 1 again to ask Officer Hutton questions about the events on May 13. Officer Hutton testified he recognized his dash camera video from Government Exhibit 1 and confirmed he had previously reviewed it.

Officer Hutton stated he arrived on the scene to assist the other officers who were conducting a traffic stop at the Exxon at Cherry and Magnolia after being called on the police

---

[8] Defense counsel again objected on grounds of hearsay. The Court overruled the objection and received the evidence, stating that it would be given its appropriate weight.

radio. Officer Hutton identified himself from Officer's Lively's dash camera video. He stated when he arrived on the scene, he went to speak with Officer Strickenberger to see what was going on, which vehicles were involved, and what assistance he needed. He stated Officer Strickenberger directed him to the red Acura. Officer Hutton explained he observed a driver, a front-seat passenger, and a backseat passenger on the passenger side of the red Acura, and he also observed a bottle of alcohol that was eventually taken from the individual sitting in the front passenger seat and placed on the hood of the car.

Officer Hutton stated that he interacted with the backseat passenger, and Defendant was that individual. Officer Hutton said he spoke with Defendant to gather information from him because Officer Rourke asked him to get the identification of the backseat passenger while he obtained the identification of the driver and the front seat passenger. Officer Hutton was advised by Defendant that he did not have any identification on him; however, Officer Hutton testified he is able to check for identification electronically using a date of birth or social security number.

Officer Hutton testified officers can use NCIC on their vehicle computers. NCIC is an internal research database officers can use to obtain a picture or a driver's license number based on information inputted into the program. NCIC allows officers to confirm that information they collect is accurate and to check for outstanding warrants.

Officer Hutton testified Defendant was speaking with someone on a cellphone during their encounter. Officer Hutton stated he asked the occupants of the car if they had any weapons, and he eventually asked Defendant to hand him something out of the car. Officer Hutton stated the object in question appeared to be a plastic baggie Defendant was holding. Officer Hutton described it as "a corner of, like, a sandwich bag . . . ." Defendant gave the bag to Officer Hutton, who testified it was empty at that time.

15

Officer Hutton stated he asked Officer Lively if Defendant's identifying information had lined up, and it had at that time. Officer Hutton testified the red Acura was being detained at that time for investigative purposes. Officer Hutton also testified Defendant described the fourth passenger, who had previously been in the car. Officer Hutton added that the fourth passenger never returned to the car. Officer Hutton identified the driver as the individual who was removed from the red Acura and appears on Officer Lively's screen at approximately 13:13:10.[9] Officer Hutton stated the occupant sitting in the front passenger seat and Defendant were then removed from the vehicle.

Officer Hutton described the process of removing Defendant from the vehicle and what happened immediately thereafter. Officer Hutton testified he asked Defendant to step out of the vehicle while keeping his hands above his head so a pat down could be performed to check for weapons. Officer Hutton said he did not immediately feel anything he recognized as a firearm or any other weapon, so he sat Defendant on the hood of Officer Lively's car. Officer Hutton specified his hands did not actually go inside of Defendant's pockets—he only patted down the outside of his person.

The Government continued the video but asked why Officer Hutton's audio cut out at approximately 13:13:13. Officer Hutton explained it is normal for officers to turn off their microphones when interacting with each other, and at that time, officers did not have body cameras, so they would wear a belt-mounted microphone that had an off-on button on the bottom. He stated policy and common practice at the time when discussing an investigation with another officer was to temporarily mute the microphone, which would be turned back on once an officer reengages with the public. The Government continued the video but stopped it at approximately

---

[9] Any time stamps herein refer to Government Exhibit 1 unless otherwise specified.

16

13:16:32 to ask about what was occurring on Officer Hutton's dash camera video. Officer Hutton stated Officer Baldwin arrived with his K-9 partner and searched around the red Acura. He testified the K-9 alerted on the vehicle.

Officer Hutton explained that during the portion of the video without audio, he approached Officer Strickenberger to see how the situation was developing and what he needed the officers to do to assist. He also stated a young female arrived who called out "Akeem" to get someone's attention—apparently directed at Defendant. After that, Officer Hutton returned to Defendant. Officer Hutton testified that, upon hearing the young female call out "Akeem," Defendant turned his head and looked in that general direction.

Officer Hutton stated that he had not received the name "Akeem" from Defendant when he was speaking to him, and he had not yet asked Officer Lively if he had been able to pull up a picture of him, so he placed him in handcuffs. Additionally, Officer Hutton testified the name issue along with the torn baggie he had been handed previously—as well as Defendant's general demeanor—made him feel as though placing Defendant in handcuffs was the most appropriate course of action until Defendant could be properly identified. Officer Hutton stated he was approximately five feet and eleven inches tall while Defendant was approximately six feet and two or three inches tall. He also commented several times throughout the video that Defendant was a bigger guy compared to himself.

Officer Hutton testified that by approximately 13:18:33 in the video, the young female had brought Defendant's identification, but Officer Hutton had not yet looked at it. Officer Hutton said he did eventually look at the identification, and he noted it listed Defendant as being five feet tall. The identification was passed to Officers Rourke and Lively, and they used their computer to conduct further research into the discrepancy. Officer Hutton stated, at that point, he had started

17

to suspect Defendant was committing criminal impersonation. Officer Hutton specified Defendant was not under arrest yet, but he was being detained while the discrepancies were being investigated, and the officers were preparing to search the vehicle due to the K-9 unit alerting on it.

Officer Hutton testified he had stated in the video, "Everybody is about to go in a car, so we can search this car." Officer Hutton explained it is common practice to place individuals in the back of a police car or right next to it so they can be separated from the vehicle being searched. The video reveals that Defendant was placed in the back of a police vehicle prior to the search of the red Acura but after the drug dog was deployed around the car. Officer Hutton testified he participated in the search of the Acura, and suspected narcotics were found in it. Officer Hutton testified the narcotics were found in the backseat and the back hatch area of the red Acura. Officer Hutton also testified he conducted a search of Defendant's pockets after the search of the red Acura, and Defendant was placed under arrest.

Attorney Kurtz proceeded to cross examine Officer Hutton. Officer Hutton testified he arrived on the scene at approximately 13:02:05. Officer Hutton approached the red Acura and had first contact with the occupants at approximately 13:02:27. Officer Hutton knew nothing about the occupants when he approached the vehicle. Officer Hutton approached the passenger front door at first. Officer Hutton stated he observed two white males in the front, a driver and a passenger. Officer Hutton testified immediately behind the front seats is a second row, where Defendant had been sitting, and the red Acura had a third row of seats.

Officer Hutton testified that at 13:03:30 in the video, he moved from the front passenger door to the rear passenger door, which he opened, and that was the first time he interacted with Defendant. Officer Hutton stated he was attempting to solicit personal identifying information

from Defendant to identify him. Officer Hutton testified Defendant gave him his first and last name, date of birth, social security number, and his physical address. Officer Hutton testified he had no reason to doubt the validity of the information given to him by Defendant, and he told Defendant his identification was not needed because his information could be pulled up on the computer, which was a task performed by Officer Lively.

Officer Hutton stated he did not photograph the baggie given to him by Defendant, and he believed he gave it to Officer Strickenberger. Officer Hutton did not complete any chain of custody forms for the baggie, and he did not log it into evidence in any way. Officer Hutton testified he did not know where the baggie was located or if Officer Strickenberger knew the location of the baggie.

Officer Hutton stated Officer Lively indicated all of Defendant's information he previously provided came back properly.[10] Officer Hutton testified he still had no reason to doubt the validity of Defendant's information, and because of Officer Lively's report, he knew there were no outstanding warrants or holds on Defendant. He testified he had no reason to suspect Defendant of any illegal activity at that time.

Attorney Kurtz moved the video to 13:13:10 and asked if this was the point that Orr exited the vehicle, followed by Defendant at approximately 13:13:31, with whom Officer Hutton had been speaking for about ten to eleven minutes. Officer Hutton testified that was correct, and he said again he had no reason to suspect Defendant of illegal activity during that period. Officer Hutton testified Defendant was not free to leave at that point.

Hutton testified he patted down Defendant immediately after he exited the vehicle. Attorney Kurtz asked him if he had any reason to believe that Defendant was armed at that point.

---

[10] *See infra* note 11 and accompanying text.

Officer Hutton explained, as can be seen in the video, he (Officer Hutton) was wearing shorts and a short-sleeve polo shirt on that day, but he could not specify what the temperature had been; however, Officer Hutton noted that Defendant was wearing a large coat. He also stated he was familiar with the investigations that Officer Strickenberger conducted, both as a KPD officer and as an ATF task force officer, and it was his understanding Defendant was going to be asked to step out of the vehicle and sit on the hood of the car. Officer Hutton stated, based on those factors, it was reasonable to see if Defendant had a gun in his waistband or on his person.

Attorney Kurtz clarified that his question was whether Officer Hutton had any reason to believe that Defendant was armed at that time. Officer Hutton said, "As much as any other time that I've pulled someone out of a car given those set of circumstances." Officer Hutton testified Defendant had been responsive to his questions for the ten to eleven minutes he had interacted with him at the vehicle, he had been agreeable, he had been pleasant in his demeanor, he had been responsive to questions about where he lived prior and about where his family lived, he had been appropriate with him, and he had maintained appropriate eye contact with him. Officer Hutton also testified Defendant had not been aggressive in any way, had not been evasive in any of his answers, and he had not smelled like any illegal drugs.

Officer Hutton testified he had observed Defendant's immediate surroundings and also looked into the vehicle after Defendant was removed from it, and he had been looking for any weapons or contraband in the immediate proximity and in plain view. Officer Hutton stated he did not remember seeing anything in the rear passenger seat where Defendant had been sitting. Officer Hutton testified he had Defendant walk over to and sit on the hood of Officer Lively's vehicle for several minutes. At 13:17:22, Officer Hutton placed Defendant in handcuffs after the arrival of an unknown female. Officer Hutton testified the unknown female called Defendant

"Akeem," which led him to believe Defendant may have been committing the offense of criminal impersonation and justifying placing Defendant in handcuffs at that time.

At 13:18:15, Officer Hutton walked over to the unknown female to get Defendant's identification. Officer Hutton was then able to confirm "Akeem" was one of Defendant's middle names. The unknown female informed Officer Hutton she and others called Defendant by the name "Akeem," which Defendant stated at the scene. Officer Hutton testified, at that point, he had obtained Defendant's physical identification, and the information from the identification matched the information Defendant gave earlier.[11] Officer Hutton testified he told Officer Strickenberger that Defendant had produced a valid identification.

Officer Hutton testified he knew Defendant was not committing criminal impersonation at that point, but Defendant was not uncuffed at that point. Officer Hutton testified Defendant was still being detained because of the ongoing investigation. Officer Hutton stated Defendant was placed in the back of the police vehicle even after it was revealed that he was not committing criminal impersonation because he generally had a nervous demeanor—even though he had been cooperative and easy to get along with up to that point.[12] However, Officer Hutton also testified Defendant had displayed calm movements while on the front of Officer Lively's police vehicle.

---

[11] Officer Hutton also testified that the identification presented to him indicated that Defendant was five feet tall, and that concerned Officer Hutton because he is taller than that and Defendant was taller than himself. However, Officer Hutton testified later that Defendant has no control over what height is listed on the identification, because the state is in control of that.

[12] In addition to Officer Hutton's testimony that Defendant appeared to be nervous, Officer Hutton testified that Defendant was still being detained because he was a subject of the ongoing investigation. It is unclear what specific knowledge Officer Hutton had of the ongoing drug trafficking investigation; however, the video reveals that prior to Defendant being placed into the back of a police vehicle, Officer Strickenberger came over to Officer Hutton and Defendant, who had been placed in handcuffs by this point. At that time, Officer Strickenberger had already been informed by McKinney that Defendant was a drug dealer, and a K-9 unit had been deployed and alerted on the vehicle. It was only after Officer Strickenberger came over to Defendant with the aforementioned knowledge in mind that Defendant was placed in the back of a police vehicle.

21

Officer Hutton also testified, during his interactions with Defendant while seated in the red Acura, he had been non-combative, non-evasive, cooperative, and calm.

Officer Hutton testified that neither Orr nor Abbott were handcuffed prior to the search of the vehicle, and they were not placed into the back of a police car when Defendant was. Officer Hutton stated only Defendant was handcuffed and placed in a police car because of the circumstances surrounding his name and nervous demeanor.

Officer Hutton stated he started his search of the red Acura by going to the back of the rear passenger-side door. He testified he recalled finding a red backpack but could not remember exactly where it had been found. Attorney Kurtz then pulled up Government Exhibit 2—showing the backpack and baggies from earlier. Officer Hutton testified he could not remember finding anything in Defendant's seat, the one directly behind the front passenger seat, and the suspected narcotics were found in the third-row seat and in the rear cargo area of the vehicle. Officer Hutton testified he recalled Defendant telling him there had been a fourth occupant in the vehicle, but Officer Hutton did not know who it was and did not attempt to interview him.

The Government proceeded to examine Officer Hutton on redirect. Officer Hutton testified Officer Strickenberger had informed him and the other officers the gold SUV and the red Acura were related to the investigation. He also testified the red Acura was not free to leave the scene and was being detained for investigative purposes. Finally, Officer Hutton testified he had stated at the scene that all the occupants of the red Acura were going to go into the back of police cars while the vehicle was being searched.

Officer Hutton testified, prior to the search of the red Acura, he had confirmed Defendant's identity but had not released him. Officer Hutton also stated the search of the vehicle took place at 13:21:10, almost nineteen minutes after he had first contact with the occupants of the red Acura,

and almost eighteen minutes after his contact with Defendant when he opened the rear passenger door where he had been sitting.

The Government then called its final witness, Co-defendant McKinney. McKinney testified she was the Co-defendant in this case and had been released on conditions following her initial appearance and detention hearing weeks earlier. McKinney testified she had been compliant with her release conditions.

McKinney testified she remembered going to an Exxon gas station on May 13, 2020 and recalled being approached by Officer Strickenberger. McKinney stated she was "blue lighted" when she got to the Exxon gas station, and Officer Strickenberger, who McKinney referred to as "Todd," approached her and called out her name while indicating he wanted to speak with her. McKinney agreed to speak with Officer Strickenberger.

McKinney testified Orr, her father Abbott, and Defendant had all been present at the Exxon station at that time. McKinney testified she knew Defendant only by the name "Gizmo" at that time. McKinney stated she exited her vehicle after being asked to do so by Officer Strickenberger. McKinney testified Officer Strickenberger asked her about the people in the car behind her and stated that he wanted to speak with her about some guns she had purchased.[13] McKinney

---

[13] Attorney Kurtz objected at this point, arguing this testimony was not relevant on the issue as to whether the officers had either reasonable suspicion or probable cause to detain Defendant at that time. The Government argued McKinney's testimony went directly to her knowledge and the information she gave to Officer Strickenberger, which he subsequently communicated to Agent Ernst and the other officers on the scene prior to any other interactions with the red Acura. The Government argued the testimony gives context to McKinney's initial contact with law enforcement and then the contact between law enforcement and the occupants of the red Acura. Attorney Kurtz argued there had been no testimony from Officer Hutton that he knew any of this information, and he testified only to the extent of the information he had available to him when he first walked up to the red Acura and then throughout the course of that interaction. The Government argued it had asked Officer Hutton and Officer Strickenberger if they had briefed each other on the scene, and they both answered affirmatively, and that the information provided by McKinney would have been part of that briefing. The Court reiterated that evidentiary rules do not operate with full effect at hearings like this and permitted McKinney to continue testifying.

continued, testifying she told Officer Strickenberger Defendant was Orr's "friend/dealer." McKinney testified she meant Defendant was Orr's drug dealer.[14]

Attorney Kurtz proceeded to cross-examine McKinney, starting by asking about her history and knowledge as it pertained to this case. McKinney testified she was arrested on November 4, 2021, and she had been unaware that Defendant had been charged in federal court via the indictment filed on April 7, 2021. McKinney testified she first became aware of the federal charges when Officer Strickenberger informed her a few days before she turned herself in on November 4, and she was unaware she was a co-defendant in a federal indictment from April 27, 2021, until November 4, 2021. McKinney testified she had been living at 3535 Rothmoor Drive in Knoxville, Tennessee, during that time.

Attorney Kurtz noted that McKinney had referred to Officer Strickenberger as "Todd" throughout her testimony and asked if she knew him prior to May 13, 2020. McKinney testified she had not known Officer Strickenberger prior to that date. Attorney Kurtz asked if she had had any contact with Officer Strickenberger from May 13, 2020, until a few days prior to her arrest on November 4, 2021. McKinney testified she turned herself in on November 4, 2021 and had contact with him on May 13, 2020. McKinney testified the only interview she could remember having was the day she and the others had been detained at the gas station and later that same day at the organized crime office.

---

[14] Attorney Kurtz then asked for the production of any Jencks material. The Government responded it did not have any Jencks material to provide because there was no prior sworn or recorded statement of McKinney other than the notes that had previously been provided in Officer Strickenberger's report and which had previously been disclosed in discovery. The Court asked the Government if it was representing that McKinney's testimony was the first time the Government had heard of McKinney's statement. The Government responded that was correct, and further that the only other recorded interview of McKinney was also turned over in discovery and was in Attorney Kurtz's possession. Attorney Kurtz confirmed that was correct.

McKinney testified she had been released within a week of her arrest on November 4, 2021. McKinney testified she had not been in contact with the prosecuting attorneys or law enforcement officers in relation to this case aside from that day of Defendant's suppression hearing. McKinney testified her attorney, Josh Hedrick, had told her she was going to be called to testify at the suppression hearing. McKinney testified she had not signed a plea agreement yet.

McKinney testified she had not known Defendant for very long as of May 13, 2020, "maybe a few months." McKinney testified she knew Defendant was Orr's drug dealer, and he had been dealing heroin.[15] McKinney testified she did not know how long Orr had known Defendant, but she was introduced to Defendant by Orr. McKinney testified Orr had been a convicted felon on May 13, 2020, but she said she did not know her father, Abbott, had an extensive criminal history aside from getting in trouble for drinking. McKinney testified she was unaware her father had been a suspect in several burglaries. McKinney testified she was familiar with Walters, and he had been in the red Acura on May 13. She stated she knew Walters had an extensive criminal history.

At the end of the hearing, Defense Exhibit 7 was admitted into evidence. Defense Exhibit 7 is a photograph depicting the cargo area of the red Acura taken on May 13, 2020. Defense Exhibit 8 was also admitted into evidence. Defense Exhibit 8 is a photograph depicting the front of the red Acura taken on May 13, 2020.

---

[15] The Court finds McKinney's testimony that she told Officer Strickenberger that Defendant was a drug dealer is credible. The Court notes that McKinney's admitted drug use while on release as well as the fact that she seems to have been dishonest about her compliance with her release conditions when asked at the suppression hearing casts doubt on the reliability of her testimony. However, McKinney's testimony is corroborated by Officer Strickenberger's testimony that McKinney told him that Defendant was a drug dealer. As such, the Court has considered McKinney's testimony with the foregoing in mind.

25

## III.   FACTUAL FINDINGS

The following factual findings are taken from the testimony and exhibits presented at the suppression hearing:

This matter arises initially out of an investigation being conducted by Officer Strickenberger and Agent Ernst, both with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF").  On May 13, 2020, Officer Strickenberger and Agent Ernst were surveilling the residence of McKinney, the Co-defendant in this matter, in relation to an investigation concerning several firearm purchases.   Officer Strickenberger and Agent Ernst observed McKinney drive away from the residence in a gold SUV, followed immediately by a red Acura containing several occupants.   The gold SUV was known by Officer Strickenberger to be associated with McKinney.  The officers followed the vehicles, which eventually parted, and then the officers followed McKinney to a pawn shop and an Exxon gas station.  Officer Strickenberger conducted a traffic stop of McKinney's gold SUV at the Exxon station based on his prior knowledge of her suspended driver's license.  During the traffic stop, Officer Strickenberger saw that the same red Acura was also present at the gas station and that McKinney's boyfriend, Orr, was in the driver's seat.   Officer Strickenberger advised Agent Ernst that Orr's driver's license was suspended.

A traffic stop was initiated by law enforcement.   Officer Strickenberger approached McKinney's gold SUV first, and he informed her why she was stopped.  Officer Strickenberger then walked over to the red Acura and, while approaching it, he observed Orr as the driver, Abbott as the front passenger, and Defendant as the rear passenger.  Orr admitted to Officer Strickenberger that there was contraband in the red Acura.  Officer Strickenberger called for other officers to report to the scene and then resumed talking with McKinney.   McKinney told Officer

26

Strickenberger that Defendant, whom she knew only as Gizmo, was a drug dealer for whom she had purchased firearms, and he was the backseat passenger of the Acura. KPD Officer Chris Hutton arrived on the scene and asked Officer Strickenberger how he could assist. Officer Strickenberger briefed Officer Hutton on the situation and asked him to assist with the stop of the Acura.

Officer Hutton was assigned to get Defendant's identification. While speaking with Officer Hutton, Defendant provided his name as "Samuel Hill" but did not have identification on his person, so Officer Hutton gathered Defendant's date of birth, social security number, and other identifiers to enter into a law enforcement database. While talking with Defendant, who was seated in the second row of seats in the Acura, Officer Hutton noticed Defendant had an item in his hand. At Officer Hutton's request, Defendant gave him the item, which was an empty corner of a plastic baggie. The officers directed all three occupants of the Acura to get out of the vehicle and to stand by patrol cars. Officer Hutton frisked Defendant and directed him to stand against the hood of a patrol car. While Defendant and the other occupants were seated on the back of the police vehicle, KPD Officer Brian Baldwin arrived on the scene and deployed his drug detection dog around the Acura. The dog alerted on the driver's side front door.

After the dog sniff but prior to Defendant being placed in the back of a police vehicle, a woman arrived on the scene and addressed Defendant as "Akeem." Officer Hutton then placed Defendant in handcuffs based on suspicion of providing a false name. Officer Hutton checked Defendant's identification, which had been brought to the scene by the woman who called him "Akeem," and learned that "Akeem" was one of Defendant's middle names. Despite confirming Defendant's identity, Officer Hutton did not remove Defendant's handcuffs at that time. Officer Strickenberger, having learned from McKinney that Defendant was a drug dealer, conferred with

27

the officers detaining Defendant, who was then placed into the back of a police vehicle by an unnamed officer.[16]

Based on the K-9 alert and consent from the driver, Orr, the red Acura was searched. Officers found a loaded 9mm handgun in the front passenger door pocket and multiple baggies containing suspected heroin and a small bag of marijuana in the rear of the red Acura, near where Defendant had been seated. Defendant was then removed from the back of the police vehicle and searched. An officer seized $2,100 in currency and two cell phones from Defendant's pockets.

## IV.    ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. Defendant asserts that he was seized when Officer Hutton ordered him out of the vehicle or, at the latest, when he was placed in handcuffs. Defendant argues that "police had no indication that Mr. Hill was engaged in criminal activity" when he was seized. [Doc. 22 at 3]. Defendant contends that "[a]t no time prior to the search of Mr. Hill did law enforcement have either reasonable suspicion or [probable] cause to detain or arrest [him]." [Doc. 22 at 3]. Defendant maintains that Officer Strickenberger relied on the fact that Defendant had $2,100 in his pockets, which Officer Strickenberger claimed was indicative of narcotics trafficking, when deciding to charge Defendant. [*Id.* at 3–4]. Defendant argues that because he was arrested without reasonable suspicion or probable cause, the $2,100 in U.S. currency and the two cellphones found when Defendant was searched are fruit of the poisonous tree that tainted the remainder of the

---

[16] While the video does not directly show Defendant being placed into the vehicle, it does reveal that an unnamed officer approached Defendant after Officer Strickenberger briefly spoke to him (the unnamed officer) and others following Defendant being placed in handcuffs and after Officer Hutton reviewed the identification. The unnamed officer appears to walk Defendant outside of the view of the video but towards the police vehicle into which Defendant was placed. Shortly after Defendant and the unnamed officer exit the video's field of view, Officer Hutton reappears on the screen and walks towards the red Acura to begin the vehicle search.

investigation and subsequent charges against him. Therefore, Defendant asks the Court to issue an order suppressing the currency and cellphones found on Defendant's person.

The Government argues that the Motion to Suppress Physical Evidence should be denied because the detention of Defendant, his arrest, and the search of the vehicle Defendant previously occupied were lawful. The Government states that law enforcement was aware that both McKinney and Orr had suspended driver's licenses, which provides a valid basis for the traffic stop.[17] As a threshold matter, the Court agrees with the Government's argument that the traffic stops conducted on McKinney and Orr were justified.

### A. Stop of Acura and Detention of Defendant

A traffic stop qualifies as a "seizure" for purposes of the Fourth Amendment. *United States v. Bell*, 555 F.3d 535, 539 (6th Cir.) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)), *cert. denied*, 557 U.S. 945 (2009); *see also United States v. Guajardo*, 388 F. App'x 483, 487 (6th Cir. 2010) ("The Fourth Amendment's prohibition against unreasonable searches and seizures by the government 'extend[s] to brief investigatory stops of persons or vehicles that fall short of traditional arrest.'") (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). In *United States v. Simpson*, the Sixth Circuit held law enforcement must have probable cause to initiate a traffic stop for a completed misdemeanor, such as veering into an emergency lane, but only reasonable suspicion for a traffic stop for an ongoing misdemeanor, such as driving on a suspended license. 520 F.3d 531, 539–41 (6th Cir. 2008); *see, e.g.*, *United States v. Sandridge*, 385 F.3d 1032, 1036 (6th Cir. 2004) (holding officer validly stopped car based on reasonable suspicion that defendant was driving without a valid license), *cert, denied*, 543 U.S. 1129 (2005); *United States v. Shelton*,

---

[17] It is not entirely clear from Defendant's motion or from the arguments presented at the suppression hearing that he is contesting the validity of the initial traffic stops conducted against Orr and McKinney. Nevertheless, the Government has argued in support of the validity of the traffic stops, so the Court has analyzed this issue for completeness.

No. 2:18-056-JTF-DKV, 2019 WL 3417369, at *2 (W.D. Tenn. Apr. 1, 2019), *report and recommendation adopted by*, 2019 WL 2563821 (W.D. Tenn. June 21, 2019), *aff'd*, 817 F. App'x 217 (6th Cir. 2020); *United States v. Henderson*, No. 2:16-20054-JTF-DKV, 2016 WL 11257355, at *3 (W.D. Tenn. Dec. 8, 2016), *report and recommendation adopted by*, 2017 WL 680443 (W.D. Tenn. Feb. 21, 2017).

"[I]f at the time of the stop the officer had a reasonable suspicion that the target was violating a traffic law or ordinance, 'then it simply does not matter whether [the officer] intended to stop [the defendant] on the basis of that traffic violation' or instead intended to stop the defendant because he suspected criminal activity was afoot." *Shelton*, 2019 WL 3417369 at *2 (quoting *United States v. Hughes*, 606 F.3d 311, 316 (6th Cir. 2010)). In *Hughes*, the Sixth Circuit stated that:

> [I]n order for [a] traffic stop to be permissible under the Fourth Amendment, a police officer must know or reasonably believe that the driver of the car is doing something that represents a violation of law. This is not to say that officers must be able to, at the time of the stop, cite chapter and verse – or title and section – of a particular statute or municipal code in order to render the stop permissible. This rule might be better stated as saying that police officers may not look for after-the-fact justifications for stops that would otherwise be impermissible; following a stop, the government should not begin poring through state and local traffic ordinances looking for any that a suspect might have violated.

606 F.3d at 316. Reasonable suspicion exists when the investigating officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). "Reasonable suspicion requires more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012) (citations omitted). Whether an officer's suspicions are reasonable is assessed in light of the totality of the relevant circumstances. *United*

*States v. Cortez*, 449 U.S. 411, 417–18 (1981). On the other hand, "the requirements of probable cause are satisfied where 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *United States v. Davis*, 430 F.3d 345, 352 (6th Cir. 2005) (citations omitted).

In the instant case, the Court finds that at the time of the May 13, 2020 traffic stops, Officer Strickenberger had a reasonable suspicion of ongoing misdemeanors—that McKinney and Orr were operating motor vehicles with suspended licenses in violation of Tenn. Code Ann. § 55-50-504. The Court finds Officer Strickenberger's testimony that he investigated McKinney and Orr as part of his investigation into the potential federal gun laws he suspected McKinney of violating to be credible. Officer Strickenberger testified that in early May 2020 he conducted an initial database search on McKinney and Orr after noticing that McKinney had purchased six firearms in multiple transactions over a two- or three-day period at the end of April 2020, which he testified was a possible indicator of "straw purchasing." The database search revealed that McKinney's and Orr's drivers' license were suspended. Officer Strickenberger testified that he was able to deduce through some of KPD's reporting systems that McKinney had some reports made with Orr, who Officer Strickenberger suspected was McKinney's boyfriend and a known Gangster Disciple, and that led him to investigate both Orr and McKinney. These facts, added together, raised Officer Strickenberger's suspicions that McKinney may have been illegally purchasing firearms for a local gang.

Officer Strickenberger further testified that he rechecked the drivers' license statuses of McKinney and Orr on the morning of the traffic stop, May 13, 2020, because of his plan to conduct surveillance on McKinney's home on that same day. Officer Strickenberger's search on May 13

again showed that both of their licenses were suspended. The Supreme Court has recognized that states have a "vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles [and] that licensing, registration, and vehicle inspection requirements are being observed." *Delaware v. Prouse*, 440 U.S. 648, 658, (1979); *see, e.g.*, *Kansas v. Glover*, 140 S. Ct. 1183, 1188 (2020). Accordingly, the Court finds that Officer Strickenberger had a reasonable basis for suspecting that Orr and McKinney were operating motor vehicles with suspended licenses, and he therefore properly effectuated the traffic stops.

Next, the Government argues that "once a vehicle is initially and lawfully stopped for a traffic violation, an officer's order that the driver get out of the vehicle is a '*de minimis*' intrusion. [Doc. 23 at 4 (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977))]. The Court agrees. An officer may properly ask a driver to get out of his or her vehicle during a traffic stop. *Mimms*, 434 U.S. at 111; *United States v. Alexander*, 467 F. App'x 355, 362 (6th Cir.), *cert. denied*, 566 U.S. 1004 (2012). In *Maryland v. Wilson*, the Supreme Court extended the rule of *Mimms*, which provides that police may order the driver out of a car during a traffic stop, to passengers. 519 U.S. 408, 415 (1997) (holding that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop"); *see also Alexander*, 467 F. App'x at 362 ("[A]n officer does not violate the Fourth Amendment during a traffic stop by asking for passenger identification, even where there was no reasonable suspicion of any wrongdoing by the passengers."). Thus, the Court finds that law enforcement could properly have Defendant exit the vehicle, even if the only issue being investigated had been the suspected traffic violation.

## B. Frisk of Defendant

It is not entirely clear from Defendant's Motion to Suppress that he specifically objects to the pat down of his person conducted by Officer Hutton immediately following his removal from

the vehicle. The Court finds that, in any case, the pat down was reasonable and appropriate under the circumstances. Additionally, the items that are the subject of the Motion to Suppress were not seized as part of the initial pat down.

An officer may frisk an individual for weapons to assure the officer's safety, if a reasonable officer under those circumstances would be justified in believing the person was "armed and dangerous." *Terry,* 392 U.S. at 27; *United States v. Smith*, 594 F.3d 530, 542 (6th Cir. 2010). "[A] frisk for weapons is justified only where specific and articulable facts give a policeman reasonable grounds to believe that an individual is armed and dangerous." *United States v. Bell*, 762 F.2d 495, 497 (6th Cir.), *cert. denied*, 474 U.S. 853 (1985). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27. The presence of specific and articulable facts is determined by examining the totality of the circumstances. *Bell*, 762 F.3d at 499.

The Court notes that the Sixth Circuit has expressly rejected the argument that the occupant of a vehicle linked to drug trafficking can be frisked solely because of his or her location in the vehicle: "[A] person's mere presence in a car, which the police believe is connect to drug trafficking, is not an automatic green light for frisking that person." *United States v. Noble*, 762 F.3d 509, 523 (6th Cir. 2014). "The Supreme Court has made clear that an officer must have specific, articulable reasons to believe that *a particular person* is armed and dangerous before the officer may frisk a suspect." *Id.* (emphasis added). However, information that the passenger is located in a car connected with drug trafficking or a drug trafficker can, along with other information known to the officer, contribute to a reasonable suspicion that the person is armed and

33

dangerous. *See Bell*, 762 F.2d at 502 (finding officer had reasonable suspicion to frisk passenger due in part to driver being known to be armed and dangerous).

Officer Hutton testified that upon directing Defendant out of the car, he conducted the pat down because he was looking for weapons that may have been concealed on Defendant's person. The next question is whether Officer Hutton had specific and articulable facts from the totality of the circumstances to justify the frisk. The Court finds that such facts existed to justify the pat down. Officer Hutton testified that he was wearing shorts and a short-sleeve polo shirt on that day. Officer Hutton was unable to say what the exact temperature had been on that day, but the implication was that it was warm enough for the type of clothing he (Officer Hutton) was wearing. Officer Hutton noted that Defendant, on the other hand, was wearing a large coat. Officer Hutton also testified that he was familiar with the types of investigations that Officer Strickenberger conducts as a KPD officer and ATF task force member. The testimony indicates that Officer Strickenberger routinely deals with cases involving both narcotics and firearms, among other things. Finally, Officer Hutton testified that Defendant was holding an empty corner of a plastic baggie, when Officer Hutton spoke with him as he was seated in the Acura. All that considered, the Court finds that the pat down was reasonable under the totality of the circumstances to assure the safety of Officer Hutton and the other officers. The Court notes that the pat down was brief and ended immediately once Officer Hutton determined that no weapons were present on Defendant's person. Moreover, no evidence was seized as a result of the frisk of Defendant.

**C. Handcuffing and Search of Defendant**

Defendant asserts that law enforcement lacked reasonable suspicion or probable cause to believe he was committing a crime, prior to conducting the search that led to the seizure of the cellphones and currency. The Court notes that Defendant's arguments seem to focus almost

34

entirely on the knowledge held by Officer Hutton, his interactions with Defendant, and the validity of Defendant's detention as part of Officer Hutton's suspicions that he was committing criminal impersonation. However, Defendant's arguments ignore the ongoing drug trafficking investigation. The Court finds that the testimony and evidence presented at the hearing support the Government's position that detaining Defendant and the search that led to the seizure of the cellphones and currency were appropriate under the circumstances.

Officer Hutton testified that Defendant was detained by the front of a patrol car, while Officer Baldwin led the drug dog around the Acura. Officer Hutton handcuffed Defendant when he suspected that Defendant had given a false name. Upon checking Defendant's identification and confirming Defendant's identity, Officer Hutton did not remove the handcuffs. Instead, following the drug dog's alert, Officer Strickenberger, who had learned from McKinney that Defendant was a drug dealer, conferred with Officer Hutton and the other officers. An unnamed officer then placed Defendant in the back of a police vehicle.

The Court notes that handcuffing Defendant and placing him into the back of the police car may have converted the investigatory detention of Defendant into a full arrest, which would require probable cause. *See, e.g.*, *United States v. Richardson*, 949 F.2d 851, 856 (6th Cir. 1991) ("[W]e have no doubt that if after refusing to consent to a search, a reasonable person was placed in the back of a police car by law enforcement agents who had no intent to allow him to leave, that person would have believed that he was not free to leave. Therefore, we conclude that when [the suspect] was placed in the police cruiser, he was seized within the meaning of the Fourth Amendment."). The Court notes that the facts of *Richardson* do not perfectly align with the facts here. However, the intrusiveness of the detention undoubtedly increased when Defendant was cuffed and placed in the back of a police car.

35

Whether or not Defendant was arrested for purposes of the Fourth Amendment at the time he was handcuffed and placed in the police car, the Court finds that the officers did have probable cause to effect an arrest on Defendant at this point. The Court also notes that Defendant argues Officer Hutton had no knowledge of the ongoing drug trafficking investigation such that it was his duty to uncuff Defendant immediately upon his realization that Defendant was not committing criminal impersonation. The Court disagrees. At the point when Officer Hutton realized Defendant was not committing criminal impersonation, Officer Strickenberger had already been informed by McKinney that Defendant was a drug dealer, Orr had admitted that there was contraband in the vehicle, and a K-9 unit had been deployed and alerted on the vehicle.

The Court notes that the full extent of Officer Hutton's knowledge of the ongoing drug trafficking investigation is unclear, however, the "collective knowledge doctrine" is relevant and applicable in this case. The video and testimony presented at the hearing indicate that Officer Strickenberger had received information linking Defendant to drug trafficking crimes, and Officer Hutton was in communication with Officer Strickenberger throughout the stop.

> It is well-established that an officer may conduct a stop based on information obtained by fellow officers. Variously called the 'collective knowledge' or 'fellow officer' rule, this doctrine recognizes the practical reality that 'effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another' . . . . we impute collective knowledge . . . even when the responding officer was wholly unaware of the specific facts that established reasonable suspicion for the stop.

*Lyons*, 687 F.3d at 765–66 (internal citations omitted).

The Court thus finds that probable cause to arrest Defendant had been established such that placing Defendant in the vehicle was appropriate and not violative of Defendant's rights. Furthermore, after Defendant was properly placed in the police vehicle, a search of the red Acura

was conducted, and Officer Hutton testified that he participated in that search and found suspected narcotics near where Defendant had been seated. It follows that this discovery of the suspected narcotics, along with the collective knowledge mentioned previously, clearly established probable cause for the search of Defendant's pockets that led to the currency and cellphones that are the subjects of the instant motion to suppress.

Officer Strickenberger testified that McKinney had informed him she had purchased the firearms for Defendant and that he was a heroin dealer. Furthermore, Orr admitted that there was contraband in the vehicle and consented to a search of the vehicle. A drug detection dog was also brought to the scene before the vehicle was physically searched, and the dog alerted on the vehicle. An alert by a trained drug detection dog provides probable cause to search a vehicle. *United States v. Navarro-Camacho*, 186 F.3d 701, 706 (6th Cir. 1998). After the vehicle was physically searched, the officers found a firearm in the front passenger door and suspected heroin in the rear of the vehicle near where Defendant had been sitting. There was some discrepancy about where the suspected heroin was found in relation to the exact spot where Defendant had been sitting, but the Court finds that does not negate the officers' probable cause that Defendant may have been involved in drug trafficking. Instead, the location of the suspected heroin, which was near where Defendant was seated, and the information that Defendant was a drug dealer provided by McKinney to Officer Strickenberger supported that probable cause. Ultimately, the Court finds that, these facts taken together, gave the officers probable cause to believe Defendant was committing drug trafficking offenses, to arrest him for drug trafficking, and to search his person incident to his arrest. Thus, the seizure of the cellphones and currency did not violate the Fourth Amendment.

Defendant argues that he should have been immediately released, once the officers confirmed his identification and knew that he was not committing criminal impersonation. The Court finds that even when Officer Hutton confirmed Defendant's identity, Defendant was still a suspect in the ongoing drug trafficking investigation. Defendant was handcuffed based on Officer Hutton's belief he was committing criminal impersonation at approximately 13:17:29 of Exhibit 1. Although the extent of Officer Hutton's knowledge of the broader investigation was unclear, Officer Strickenberger was present on the scene and came over to where Defendant was being detained not even a full minute after he (Defendant) was placed in handcuffs. At that point, Officer Strickenberger had already been told by McKinney that she had purchased the firearms for Defendant and that he was a heroin dealer. Orr had also already admitted that there was contraband in the vehicle, and the drug dog had alerted on the vehicle. As previously discussed, the "collective knowledge" doctrine is relevant here, and that collective knowledge was sufficient to establish probable cause to arrest Defendant and search his pockets.

The Court finds that the officers had probable cause to arrest Defendant for drug trafficking, to search him incident to his arrest, and to seize the cellphones and currency from his pockets. Even if all suspicion of criminal impersonation was extinguished shortly after Defendant was handcuffed, probable cause that Defendant was involved in drug trafficking existed under the totality of the circumstances. Thus, the Court finds the seizure of the cellphones and currency comports with the Fourth Amendment.

## V.    CONCLUSION

After carefully considering the parties' arguments and the relevant legal authorities, the undersigned respectfully **RECOMMENDS** that Defendant's Motion to Suppress Physical Evidence **[Doc. 22]** be **DENIED**.[18]

Respectfully submitted,

Debra C. Poplin
United States Magistrate Judge

---

[18] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

39